## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| MINNESOTA LIFE INSURANCE COMPANY,<br><br>                    Plaintiff,<br><br>          -vs-<br><br>SHURWEST HOLDING COMPANY, INC., an Arizona corporation; and SHURWEST, LLC, an Arizona limited liability company, THE QUANTUM GROUP USA, LLC, an Arizona limited liability company, and Ron Shurts, an individual,<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Minnesota Life Insurance Company ("Minnesota Life") brings this Complaint against Defendants Shurwest Holding Company, Inc. and Shurwest, LLC (collectively, "Shurwest"), The Quantum Group USA, LLC, and Ron Shurts and alleges as follows:

### NATURE OF THE ACTION

1.      This action arises from a premium funding scheme promoted by Shurwest where certain Shurwest-affiliated agents recommended that their clients invest in "structured cash flows" offered by an entity known as Future Income Payments, LLC ("FIP") as part of an unauthorized strategy to fund the premiums on indexed universal life ("IUL") insurance policies issued by Minnesota Life.

2.      FIP was an entity unrelated to Minnesota Life that purported to sell "structured cash flows" to individual investors.  Those investors paid FIP an

upfront lump sum in exchange for a pre-determined monthly income stream based upon FIP's "purchase" of individual pensioners' future monthly pension income streams.

3.      Shurwest employee, Melanie Schulze-Miller, and others at Shurwest trained Shurwest-affiliated agents on the use of FIP "structured cash flows" as a vehicle for funding the premiums on universal life policies, and specifically, Minnesota Life IUL policies.

4.      Minnesota Life prohibits the use of "structured cash flows" to fund policy premiums.

5.      At all relevant times, Shurwest and its employees concealed the FIP premium funding scheme from Minnesota Life and on occasion even altered policy applications to overstate an applicant's income and net worth and to hide from Minnesota Life the source of premium funds.

6.      Minnesota Life discovered that Shurwest affiliated agents had recommended FIP investments in connection with funding Minnesota Life index universal life policies in late 2018 when Minnesota Life began receiving policyholder complaints that they could not pay their life insurance premiums because their FIP investment had failed.

7.      Since then, FIP has become the target of an SEC lawsuit, its assets have been placed into receivership, and its founder, Scott Kohn, has been indicted.

8.      Shurwest employee, Ms. Schulze-Miller, has pled guilty to criminal charges in connection with her role in the FIP premium funding scheme.

9.      After learning of the FIP premium funding scheme in late 2018, Minnesota Life offered rescission, returning all premiums paid, to policyholders who purchased a Minnesota Life IUL policy in association with an investment in FIP because Minnesota Life issued the policies based upon inaccurate information provided to Minnesota Life's underwriters.

10.     Minnesota Life's investigations have identified 274 Minnesota Life IUL policies sold through Shurwest between 2014 and early 2018 linked to an investment in FIP.

11.     Policyholders who were allegedly deceived by the FIP premium funding scheme promoted by Shurwest have brought numerous claims and lawsuits against Minnesota Life, all as the result of the actions of Shurwest and its representatives.

12.     Minnesota Life brings this action for damages and losses incurred as a result of Shurwest's wrongful actions.  In accordance with the terms of its Brokerage General Agency Contract with Shurwest, Minnesota Life is entitled to recover and recoup the millions of dollars it has paid to policyholders who purchased a Minnesota Life IUL policy in association with an investment in FIP, including the refund of policy premiums and any additional payments made to resolve policyholder's claims.

13.     Minnesota Life is also entitled to recover and recoup the override commissions paid to Shurwest.  Minnesota Life further seeks a declaration regarding the repayment of commissions paid to Shurwest-affiliated agents on the sale of FIP-linked Minnesota Life policies that have since been rescinded. Minnesota Life also seeks recovery of attorney's fees and costs incurred defending against claims brought by the owners of FIP-linked Minnesota Life policies.

## **PARTIES**

14.     Plaintiff Minnesota Life is an insurance company incorporated in Minnesota with its principal place of business in St. Paul, Minnesota.

15.     Defendant Shurwest, LLC is an Arizona limited liability company.

16.     On information and belief, Shurwest, LLC has two members: Defendant Shurwest Holding Company, Inc., an Arizona corporation with its

principal place of business in Scottsdale, Arizona, and  KT Equity Partners III, LLC, which is an LLC based in Topeka, Kansas, whose members are David Callanan, Derek Thompson, Cody Foster, and Jordan Canfield.  On information and belief, all the members of KT Equity Partners III, LLC are citizens of Kansas.

17.    Shurwest is an independent marketing organization that sells life insurance, annuities, and securities to consumers.

18.    In 2012, Shurwest entered into a Brokerage General Agency Contract to be affiliated with Minnesota Life as an independent general agency.

19.    Defendant The Quantum Group, USA, LLC ("Quantum") is an Arizona limited liability company, doing business in Scottsdale, Arizona.

20.    On information and belief, Quantum's members are: Quantum Holding Company, Inc., an Arizona corporation with its principal place of business in Scottsdale, Arizona, KT Equity Partners III, LLC a Topeka, Kansas LLC whose members, on information and belief, are all citizens of Kansas, and RLS Capital Holdings, LLLP, a Nevada limited liability limited partnership whose general partner is Shurts Management Company, LLC, an Arizona LLC whose members are Ron Shurts who resides in Scottsdale, Arizona and the Ronald L. Shurts Living Trust, which is located in Scottsdale, Arizona.

21.    Quantum was formed in November 12, 2018.  Minnesota Life understands that Shurwest began to rebrand itself as Quantum in February 2019. On information and belief, Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors and officers as Shurwest, offers all of the services Shurwest offers, and was set up as a successor entity to Shurwest.

22.    Minnesota Life alleges, on information and belief, that, at all material times herein mentioned, Quantum was the alter ego of Shurwest, and that there

was such unity of ownership and interest between Quantum and Shurwest that the two cannot be considered separate entities.

23.    Alternatively, Minnesota Life alleges, on information and belief, that at all material times herein mentioned, Quantum was the successor-in-interest to Shurwest and is liable to Minnesota Life for Shurwest's wrongdoing through the equitable doctrine of *de facto* merger.   Shurwest's business continued as Quantum, with the same employees, directors, officers, business offices, telephones, and computers as Shurwest used in its business dealings with Minnesota Life.  Quantum's creation was a fraudulent transaction, done in order to escape liability for Shurwest's obligations.

24.    Defendant Ron Shurts ("Shurts") is the President of Shurwest and owner of Quantum and is a resident of Arizona.

## JURISDICTION AND VENUE

25.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a) as there is complete diversity between Minnesota Life and all Defendants, and the amount in controversy exceeds $75,000.  Minnesota Life has suffered substantially more than $75,000 in damages as a result of Shurwest's actions described herein.

26.    This Court has personal jurisdiction over Defendants because Shurwest, Quantum, and Shurts have purposefully established significant contacts with Minnesota by virtue of Shurwest's entry into a Brokerage General Agency Contract with Minnesota Life in 2012 and its agreement to promote, market, and effectuate the sale of Minnesota Life's insurance products.  On information and belief, Quantum is an alter ego of Shurwest and/or the successor-in-interest to Shurwest.  Shurts entered into a separate agreement with Minnesota Life in March 2019 to repay the agent commissions earned by Shurwest-affiliated independent agents who sold Minnesota Life policies in connection with FIP. Defendants'

conduct alleged herein and the causes of action asserted in this Complaint arise out of or are related to their agreements with Minnesota Life, and Shurwest's conduct in the promotion, marketing and sale of Minnesota Life's IUL policies.

27.     Venue is proper in the District of Minnesota because a substantial part of the events giving rise to the claims in this action occurred in this District. 28 U.S.C. § 1391(b)(2).  Minnesota Life is based in this District and conducts its operations here.  Shurwest entered into a Brokerage General Agency Contract with Minnesota Life in this District.  Shurts entered into an agreement in this District to repay agent debt to Minnesota Life.

28.     Furthermore, Shurwest's Brokerage General Agency Contract with Minnesota Life specifies that the contract is "governed by the laws of the State of Minnesota.  Any litigation arising between the parties with respect to this Contract shall be conducted in Ramsey County, Minnesota."  (*See, e.g*., Ex. A, ¶ 4.10).

## FACTUAL ALLEGATIONS

### A.     Minnesota Life's Brokerage General Agency Contract with Shurwest

29.     Shurwest is an independent national marketing organization based in Scottsdale, Arizona that provides independent agents with access to major insurance carriers offering indexed universal life insurance and fixed indexed annuity strategies.  Shurwest also provides independent agents with education and training, marketing support, practice management and programs to attract new clients.  In return, Shurwest received compensation in the form of overrides for every sale of a policy an agent makes through them.

30.     On October 9, 2012, Shurwest was appointed as an independent general agency to sell Minnesota Life products.  (*See* Ex. A, Brokerage General Agency Contract.)

31.     The Brokerage General Agency Contract allowed Shurwest to "market" Minnesota Life to its affiliated agents, to "solicit and procure"

applications for Minnesota Life's fixed insurance products, to "deliver all issued products" and "provide service to product owners" of Minnesota Life products, to "train and manage" its affiliated agents, and to earn compensation for sales of Minnesota Life insurance policies, amongst other things. (*Id.*, p. 1.)

32.    However, Shurwest's authority to act on behalf of Minnesota Life was limited under the Brokerage General Agency Contract, which provided that "Your authority extends no further than is specifically stated in this Contract" and that  "You shall have no power or authority to act on [Minnesota Life's] behalf or to authorize Your brokers to act on [Minnesota Life's] behalf."  (*Id.*, p. 3.) Specifically, Shurwest and its affiliated independent agents were prohibited from offering for sale any products that were not included on the Brokerage Commission Schedule.  (*Id.*)

33.    The Brokerage General Agency Contract also provided that Minnesota Life had "the right to refund any premiums paid on a policy if [Minnesota Life] believe[s] this is proper where a policy is rescinded, cancelled, or not accepted, or for any other reason [Minnesota Life] believe[s] is proper. **[Shurwest] agree[s] to return to [Minnesota Life], when [Minnesota Life] ask[s] for it, all earnings which [Minnesota Life] credited to [Shurwest] on any premiums which [Minnesota Life] refund[s].**" (*Id.*, p. 2 at ¶ 2.1(d)) (emphasis added).

34.    Shurwest's Brokerage General Agency Contract with Minnesota Life also provided that "All compensation paid to [Shurwest] or [its] Brokers as provided in Section 2, on any premiums that are subsequently returned or otherwise not received by [Minnesota Life] shall, upon [Minnesota Life's] demand, become a debt [Shurwest] owe[s] to [Minnesota Life]." (*Id.*, p. 2 at ¶ 2.3(a)).

35.     Shurwest also agreed "to indemnify and hold [Minnesota Life] harmless against any damages or losses which [it] incurred as a result of [Shurwest's] actions or the actions of [its] Brokers or employees." (*Id.*, p. 3 at ¶ 4.3).  The Brokerage General Agency agreement provided that Shurwest "will be liable to [Minnesota Life] and agree to reimburse [Minnesota Life] fully for any payments made and any related expenses incurred by [Minnesota Life] in the defense and settlement of any such claim that [Minnesota Life] defend[s], pay[s] or settle[s], including costs of counsel employed for such action." (*Id.*, p. 3 at ¶ 4.5).

## B.     Shurwest's Promotion of the FIP Premium Funding Scheme

36.     Between 2014 and early 2018, Minnesota Life was the victim of a premium funding scheme promoted by Shurwest and its employee, Melanie Schulze-Miller, who trained independent agents affiliated with Shurwest to recommend to their clients the use of FIP "structured cash flows" as a vehicle for funding the premiums on universal life policies.

37.     The FIP premium funding strategy Shurwest and Ms. Schulze-Miller pitched to certain Shurwest-affiliated agents involved converting taxable assets to a tax advantaged vehicle over a period of time, by "turbocharging" the IUL product through the use of a "structured cash flow" in order to facilitate a more aggressive funding strategy.

38.     A client would withdraw money from his/her IRA or 401k and deposit the funds into a custodial IRA account.  Some funds would be released to the client to pay the premiums on an IUL policy.  The remaining funds in the custodial account (or a portion thereof) would be released to FIP for the purchase of an investment in a "structured cash flow."[1]

---

[1] FIP specialized in secondary market pension income streams.  FIP purchased pension streams from pensioners at a discounted rate with lump sum payments and matched those "structured

39.     Every month, the client would receive a monthly payment from FIP into the custodial account. The expected rate of return of the principal invested in FIP was often around 6.5%-8%.  The client would then use the "structured cash flow" funds to pay the premiums on his or her IUL policy.

40.     According to this unauthorized strategy, over a span of four to five years, and with aggressive funding, a client could convert his/her IRA or 401k monies into a substantial account value in the IUL policy.  The client could then draw upon the accumulation value through policy loans and enhance retirement cash flows.

41.     Ms. Schulze-Miller and other Shurwest employees trained Shurwest-affiliated agents on the FIP premium funding strategy—specifically, on the use of FIP "structured cash flows" in conjunction with Minnesota Life IUL policies—and provided them with webinars and sales materials to help present the strategy to clients.

42.     At no time did any of the policy applications submitted through Shurwest disclose to Minnesota Life that the actual source of premium funding would be "structured cash flows" or FIP, even when specifically asked about the source of funds during the underwriting process.  The FIP source of funds was concealed from Minnesota Life in each instance.

43.     Minnesota Life prohibits the use of "structured cash flows" as a funding source and has communicated this to its independent agents through its Policies and Procedures as follows:

> "Sales of life products when a strategy involving structured cash flows is involved.  This sales strategy encourages the prospective policyowner to lend money to an individual or individuals in return for the promise that the borrower repay the loaned funds with pension, IRA or other sources of structured income.  The individuals

---

cash flow" streams with investments from clients, who were looking for higher fixed rates of return with predictable income over a specific time frame (often five years).

lending in these transactions would then use the income stream resulting from the loan repayment as premiums into a cash value life insurance policy. **Sales involving this type of strategy are not permitted with the Companies' products**." (Exhibit C, 2017 Policies and Procedures, Life Insurance and Annuity Sales).

44.    Minnesota Life prohibits the use of structured cash flows to fund life insurance policy premiums because Minnesota Life loses money on each sale of an IUL policy that results in an early lapse. Its financial underwriting guidelines are designed to prevent the sale of policies that are not affordable or are excessive in terms of needs and goals. Had the applications for IUL policies submitted through Shurwest truthfully disclosed the source of funds for premium payment, Minnesota Life would not have issued the policies as applied for.

45.    In mid-2018, FIP shut down its business and ceased paying monthly income streams on investments.

46.    After FIP's collapse, Minnesota Life began receiving policyholder complaints and discovered that several independent agents affiliated with Shurwest had recommended the use of FIP structured cash flows to fund policy premiums on Minnesota Life's IUL policies.

47.    The FIP premium funding strategy was concealed from Minnesota Life during the application process, so that Minnesota Life's underwriting of the policies was based on inaccurate and misleading information.

48.    Minnesota Life did not approve, endorse, or encourage the FIP premium funding strategy. Rather, Minnesota Life has been financially harmed from the sale of policies using the FIP premium funding strategy.

49.    After discovering the FIP funding scheme in late 2018, Minnesota Life offered to rescind all Minnesota Life IUL policies purchased in conjunction with an investment in FIP and to refund premiums paid for those policies, primarily because the policies were issued based upon inaccurate information provided to Minnesota Life's underwriters.

50.    To date, Minnesota Life has rescinded 210 policies sold through Shurwest.

51.    Minnesota Life is entitled to recoup the amount of compensation Shurwest received on these policies pursuant to section 2.3(a) of the Brokerage General Agency Contract.

52.    Minnesota Life is also entitled to recover from Shurwest the amount of commissions paid to Shurwest-affiliated agents on FIP-linked rescinded policies, because pursuant to section 2.3(a) of the Brokerage General Agency Contract, that became a debt owed to Minnesota Life by Shurwest.

53.    Minnesota Life has also been named as a defendant in several lawsuits across the country as a result of Shurwest's sale of Minnesota Life IUL policies in connection with FIP.

54.    Minnesota Life has incurred and continues to incur attorneys' fees and costs in the course of defending these lawsuits and settling with the claimants, in an amount to be determined a trial.

C.    **Shurwest's Alteration of Policy Applications Submitted to Minnesota Life**

55.    In or around February 2018, Minnesota Life received two complaints from policyholders whose IUL policies were sold through Shurwest and whose policy applications appeared to have been altered after they were signed by the applicant.

56.    In or around March 2018, Minnesota Life initiated an investigation into Shurwest's suspected alterations or "scrubbing" of policy applications submitted to Minnesota Life.

57.    For certain policy applications, Ms. Schulze-Miller and other Shurwest employees "scrubbed" the applications for Minnesota Life IUL policies by altering the applications to overstate the income and net worth of the applicant

and to conceal that the true funding source for policy premiums was FIP "structured cash flows."

58.     On information and belief, Ms. Schulze-Miller and other Shurwest employees "scrubbed" the applications for Minnesota Life IUL policies so that Minnesota Life's underwriting team would be more likely to issue the policies with the amount of coverage as applied for.

59.     Policyholders did not authorize these alterations to their policy applications by Ms. Schulze-Miller and other Shurwest employees.

60.     Nobody at Shurwest conducted a further review of the applications after prospective policyholders submitted their applications to Ms. Schulze-Miller and her team.   The applications were submitted directly from Ms. Schulze-Miller and her team to Minnesota Life without any further evaluation or oversight by Shurwest.

61.     Minnesota Life believes that there were over one thousand policies sold through Shurwest between the period 2014 to 2018 where the policy applications were altered.  Two-hundred twenty-two (222) of those policies were linked to an investment in FIP.

62.     Minnesota Life would not have issued these policies as applied for but for the false and/or inaccurate information contained on the policy applications.

**D.    <u>Shurwest Becomes Quantum and Ron Shurts Agrees to Guarantee The Payment of Agent Debt</u>**

63.     In February 2019, Minnesota Life became aware that Shurwest was rebranding itself as Quantum.  Shurwest employees' email signatures included references to Quantum, Shurwest employees answered the phone on Quantum's behalf, and Shurwest President and Quantum owner Ron Shurts used

"Shurwest/Quantum" to refer to one entity in email correspondence with Minnesota Life.

64.     On information and belief, Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors as Shurwest, and was set up as a successor entity to Shurwest. Accordingly, Quantum is an alter ego of Shurwest and/or the successor-in-interest to Shurwest for the wrongdoing alleged in this Complaint.

65.     In March 2019, Shurts and Minnesota Life entered an agreement whereby Shurts would pay Minnesota Life $200,000 up front, and then $50,000 per month (later increased to $75,000 per month) thereafter, for the debt owed to Minnesota Life arising out of the commissions paid to Shurwest-affiliated independent agents on the Minnesota Life IUL policies that were sold in connection with an investment in FIP, which have since been rescinded.  Shurts personally guaranteed this debt.

66.     In June 2020, Minnesota Life terminated Shurwest's Brokerage General Agency Contract with Minnesota Life.

## FOR A FIRST CAUSE OF ACTION
### (CONTRACTUAL INDEMNITY AGAINST SHURWEST AND QUANTUM)

67.     Minnesota Life re-alleges and incorporates by reference paragraph 1 through 66 as if set forth fully herein.

68.     At all times relevant to the claims set forth in the Complaint, Minnesota Life and Shurwest were parties to the Brokerage General Agency Contract, which describes their relationship and Shurwest's appointment as an independent general agency for Minnesota Life.

69.     The Brokerage General Agency Contract obligates Shurwest to "indemnify and hold [Minnesota Life] harmless against any damages or losses which [Minnesota Life] incurred as a result of [Shurwest's] actions or the actions of [its] Brokers or employees." (Ex. A, p. 3 at ¶ 4.3).

70.     The Brokerage General Agency Contract provides that Shurwest "will be liable to [Minnesota Life] and agree to reimburse [Minnesota Life] fully for any payments made and any related expenses incurred by [Minnesota Life] in the defense and settlement of any such claim that [Minnesota Life] defend[s], pay[s] or settle[s], including costs of counsel employed for such action." (*Id*., p. 3 at ¶ 4.5).

71.     Accordingly, under the express provisions of the Brokerage General Agency Contract, Minnesota Life is entitled to indemnification from Shurwest for all such damages and losses and attorneys' fees, costs and other expenses incurred by Minnesota Life related to Shurwest's involvement in and promotion of the FIP premium funding scheme, and Minnesota Life's resolution of claims brought by owners of FIP-linked policies sold through Shurwest.

72.     Alternatively, Minnesota Life is entitled to indemnification from Quantum as Shurwest's alter ego and/or successor-in-interest for the damages and losses and attorneys' fees, costs and other expenses incurred by Minnesota Life related to Shurwest's involvement in and promotion of the FIP premium funding scheme, and Minnesota Life's resolution of claims brought by owners of FIP-linked policies sold through Shurwest.

## FOR A SECOND CAUSE OF ACTION
## (EQUITABLE INDEMNITY AGAINST SHURWEST AND QUANTUM)

73.     Minnesota Life re-alleges and incorporates by reference paragraph 1 through 72 as if set forth fully herein.

74.     Minnesota Life denies liability for any losses or damages alleged by a policyholder who purchased a Minnesota Life IUL policy in connection with an investment in FIP through Shurwest.

75.     Minnesota Life did not authorize, endorse or ratify any of the FIP investments or promote the FIP premium funding strategy.  In fact, the FIP premium funding strategy was concealed from Minnesota Life by Shurwest, Ms. Schulze-Miller, Shurwest-affiliated agents and employees, and the policyholders during the application process for policies and at all relevant times thereafter.

76.     The sole cause of the losses or damages incurred by these policyholders is due to the negligent or wrongful conduct of Shurwest and its employees and not any primary or affirmative act of Minnesota Life.

77.     Accordingly, Minnesota Life is entitled to indemnification from Shurwest for any and all attorneys' fees and costs, settlements, judgments, and all liability arising out of, or in any way related to Shurwest's role in the FIP premium funding scheme, and its sale of Minnesota Life IUL policies in connection with an investment in FIP.

78.     Alternatively, Minnesota Life is entitled to indemnification from Quantum as Shurwest's alter ego and/or successor-in-interest for any and all attorneys' fees and costs, settlements, judgments, and all liability arising out of, or in any way related to Shurwest's role in the FIP premium funding scheme, and its sale of Minnesota Life IUL policies in connection with an investment in FIP.

## FOR A THIRD CAUSE OF ACTION
### (NEGLIGENCE AGAINST SHURWEST AND QUANTUM - FIP PREMIUM FUNDING SCHEME)

79.     Minnesota Life re-alleges and incorporates by reference paragraph 1 through 78 as if set forth fully herein.

80.     Shurwest owed Minnesota Life a duty to exercise reasonable care, skill, diligence and prudence in ensuring that its employees and affiliated agents did not "offer for sale, in [Minnesota Life's] name, any products not included on the attached Contract Update" (Ex. A, p. 3 at ¶ 4.2(a)) and in supervising its employees and affiliated agents in their sale of Minnesota Life IUL policies.

81.     Shurwest breached that duty to Minnesota Life by negligently supervising its employees, including Ms. Schulze-Miller, who promoted and trained Shurwest-affiliated agents on the FIP premium funding strategy and provided them with webinars and sales materials to help present the strategy to clients.

82.     Shurwest further breached that duty to Minnesota Life by negligently supervising its affiliated agents who recommended to their clients the use of FIP "structured cash flows" as a vehicle for funding the premiums on Minnesota Life IUL policies.

83.     Shurwest knew or should have known that allowing its employees and affiliated agents to promote the purchase of unregistered investments was reckless and dangerous, or, at a minimum, negligent and careless.

84.     Shurwest knew or should have known that FIP was at risk of financial ruin due to ongoing legal and regulatory issues, but failed to properly supervise its employees and its affiliated-agents by allowing them to promote and recommend the FIP premium funding strategy.

85.     As a direct and proximate result of Shurwest's negligence, Minnesota Life has suffered substantial financial losses and will continue to suffer damages in an amount to be proven at trial.

86.     At all relevant times herein, Quantum was Shurwest's alter ego and/or successor-in-interest and thereby liable for the damages to Minnesota Life caused by Shurwest's negligence.

## FOR A FOURTH CAUSE OF ACTION
### (NEGLIGENCE AGAINST SHURWEST AND QUANTUM - "SCRUBBING" OF IUL POLICY APPLICATIONS)

87.     Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 86 as if set forth fully herein.

88.     Shurwest owed Minnesota Life a duty to exercise reasonable care, skill, diligence and prudence in supervising its employees, including Ms. Schulze-Miller and her team, in their submission of Minnesota Life IUL policy applications to Minnesota Life.

89.     Shurwest breached that duty to Minnesota Life by negligently supervising its employees, including Ms. Schulze-Miller and her team, who "scrubbed" policy applications by altering them to overstate the income and net worth of the applicant and also to conceal that the true funding source for policy premiums was FIP "structured cash flows."

90.     Shurwest knew or should have known that it was reckless and dangerous, or, at a minimum, negligent and careless to allow its employees, including Ms. Schulze-Miller and her team, to submit policy applications to Minnesota Life without additional review of or oversight over the applications.

91.     Minnesota Life would not have issued these policies as applied for but for the false and/or inaccurate information contained on the policy applications that resulted from the "scrubbing" of policy applications by Shurwest employees.

92.     As a direct and proximate result of Shurwest's negligence, Minnesota Life has suffered substantial financial losses and will continue to suffer damages in an amount to be proven at trial.

93.     At all relevant times herein, Quantum was Shurwest's alter ego and/or successor-in-interest and thereby liable for the damages to Minnesota Life caused by Shurwest's negligence.

### FOR A FIFTH CAUSE OF ACTION
### (BREACH OF CONTRACT AGAINST SHURWEST)

94.     Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 93 as if set forth fully herein.

95.     On October 9, 2012, Shurwest entered into a Brokerage General Agency Contract with Minnesota Life.  (*See* Ex. A).

96.     The Brokerage General Agency Contract provides specifically that "[a]ll compensation paid to [Shurwest] or [Shurwest's] Brokers as provided in Section 2 on any premiums that are not subsequently returned or otherwise not received by [Minnesota Life] shall, upon [Minnesota Life's] demand, become a debt [Shurwest] owe[s] to [Minnesota Life], payable according to paragraph 2.3(b) FIRST CLAIM ON EARNINGS" and "[Shurwest] agree[s] to promptly repay all debts to [Minnesota Life], including reasonable interest as [it] determine[s].  [Minnesota Life] ha[s] first claim on all of [Shurwest's] earnings. This means that, as an when elected, [Minnesota Life] may keep all or any part of [Shurwest's] earnings to reduce any debt [Shurwest] owe[s] [Minnesota Life]…." (*Id*., p. 2 at ¶ 2.3).

97.     The Brokerage General Agency Contract also provides that Minnesota Life had "the right to refund any premiums paid on a policy if [Minnesota Life] believe[s] this is proper where a policy is rescinded, cancelled, or not accepted, or for any other reason [Minnesota Life] believe[s] is proper. **[Shurwest] agree[s] to return to [Minnesota Life], when [Minnesota Life] ask[s] for it, all earnings which [Minnesota Life] credited to [Shurwest] on**

**any premiums which [Minnesota Life] refund[s].**" (*Id.*, p. 2 at ¶ 2.1(e)) (emphasis added).

98.  Shurwest was paid compensation in the form of overrides on all Minnesota Life policies sold by Shurwest-affiliated agents, including policies sold in association with a FIP investment.  Minnesota Life has offered to rescind the policies of any policyholder who was affected by the FIP premium funding scheme and to return the premiums paid on those policies, due to the lack of accurate or complete information regarding the source of funds for those policies which infected Minnesota Life's underwriting process.  To date, Minnesota Life has rescinded 210 policies that were sold through Shurwest with ties to investments in FIP.

99.  Shurwest, however, has failed to return the compensation it was paid by Minnesota Life for the sale of those FIP-linked IUL policies.

100.  Shurwest has also failed to return the compensation Minnesota Life paid to Shurwest-affiliated agents who sold FIP-linked IUL policies that have since been rescinded, a debt Shurwest owes to Minnesota Life pursuant to paragraph 2.3 of the Brokerage General Agency Contract.

101.  By failing to pay the amounts Shurwest owes Minnesota Life under the terms of the Brokerage General Agency Contract for IUL policies sold through Shurwest that were rescinded as a result of the FIP premium funding scheme, Shurwest has breached the contract between itself and Minnesota Life.

102.  As a result of Shurwest's breach of the Brokerage General Agency Contract, Minnesota Life has suffered damages in an amount to be determined at trial, plus statutory pre-judgment interest until the debt is paid or judgement entered.

103.   At all relevant times herein, Quantum was Shurwest's successor-in-interest and/or alter ego and thereby liable for the damages to Minnesota Life caused by Shurwest's breach of contract.

## FOR A SIXTH CAUSE OF ACTION
### (ALTER EGO/SUCCESSOR LIABILITY OF QUANTUM)

104.   Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 103 as if set forth fully herein.

105.   Quantum occupies the same office space as Shurwest, employs the same employees as Shurwest, is managed by the same directors and officers as Shurwest, offers all of the services that Shurwest offers, and was set up as a successor entity to Shurwest.  On information and belief, Shurwest's funds have also been commingled with Quantum's funds.

106.   Minnesota Life alleges, on information and belief, that, at all material times herein mentioned, Quantum was the alter ego of Shurwest, and that there was such unity of ownership and interest between Quantum and Shurwest that the two cannot be considered separate entities.

107.   Alternatively, Minnesota Life alleges, on information and belief, that, at all material times herein mentioned, Quantum was the successor-in-interest to Shurwest and is liable to Minnesota Life for Shurwest's wrongdoing through the equitable doctrine of *de facto* merger.  Shurwest's business continued as Quantum, with the same employees, directors, officers, business offices, telephones, and computers as Shurwest used in its business dealings with Minnesota Life.  The creation of Quantum was a fraudulent transaction done in order to escape liability for Shurwest's obligations.

108.  Shurwest has damaged Minnesota Life in a total amount to be determined at trial.

109.   Minnesota Life is therefore entitled to reach beyond Shurwest to the funds of Quantum for satisfaction of the amounts owed to Minnesota Life under the foregoing causes of action.

## FOR A SEVENTH CAUSE OF ACTION
## (DECLARATORY RELIEF AGAINST SHURTS)

110.   Minnesota Life re-alleges and incorporates by reference paragraphs 1 through 109 as if set forth fully herein.

111.   In March 2019, Shurts entered into an agreement with Minnesota Life to pay the debt Shurwest owes to Minnesota Life for the commissions paid to Shurwest-affiliated independent agents who sold FIP-linked Minnesota Life IUL policies that have since been rescinded.

112.   On March 10, 2019, Shurts confirmed this agreement via email to Minnesota Life employee Benjamin Roth.

113.   Specifically, Shurts agreed to the immediate repayment of $200,000 in agent debt, and then $50,000 per month thereafter "until we are out of the woods."  In his email, Shurts emphasized that "Shurwest/Quantum is committed to the partnership."

114.    As a result of Shurts' agreement with Minnesota Life, Shurts has personally guaranteed the agent debt owed by Shurwest to Minnesota Life.

115.   Minnesota Life hereby seeks a judicial determination that Shurts is personally liable to Minnesota Life for Shurwest's agent debt in the event Shurwest fails to make its monthly payments to Minnesota Life, under the terms of Shurts' agreement with Minnesota Life.

116.   Such a declaration is necessary and appropriate at this time so that Minnesota Life and Shurts may ascertain their rights and duties with respect to the claims alleged by Minnesota Life in the Complaint.  A determination of rights

as between Minnesota Life and Shurts prior to the entry of judgment in this matter is likely to facilitate resolution of the matter and avoid a separate action for breach of contract as between Minnesota Life and Shurts in the event Shurwest defaults on its payment of agent debt amounts owed to Minnesota Life.

**WHEREFORE,** having fully set forth its Complaint, Minnesota Life prays for the following:

(a)     A declaration that Shurwest indemnify and hold Minnesota Life harmless for the claims of all Minnesota Life policyholders who purchased an IUL policy through Shurwest in connection with a FIP investment;

(b)     A declaration that Shurts is personally liable for the agent debt owed by Shurwest to Minnesota Life in the event Shurwest defaults on its payments to Minnesota Life;

(c)     Judgment in an amount to be determined at trial;

(d)     Compensatory damages;

(e)     For the costs and disbursements of this action; and

(f)     For such other and further relief as the Court may deem just and proper.

Dated:  July 12, 2021

s/     Shawn M. Raiter
Shawn M. Raiter (#240424)
David M. Wilk (#222860)
**LARSON • KING, LLP**
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
Tel: (651) 312-6500
sraiter@larsonking.com
dwilk@larsonking.com

Robert D. Phillips, Jr. (*pro hac vice* forthcoming)
Kathy J. Huang (*pro hac vice* forthcoming)
Gillian H. Clow (*pro hac vice* forthcoming)
**ALSTON & BIRD, LLP**
333 South Hope St, 16th FL
Los Angeles, CA 90071
Tel: (213) 576-1000
bo.phillips@alston.com
kathy.huang@alston.com
gillian.clow@alston.com

*Attorneys for Plaintiff Minnesota Life Insurance Company*